

FILED

FEB 21 2017

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Rev. Josephenie E. Robertson, M.T.T.
Matriarch of the Miskitu Nation
1557 Jackson St. #301
Oakland, CA 94612 - U.S.A.
Telephone: 510.410.1144
Email: ercell@miskitunation.org
In Propria Persona

# In the United States District Court
# For the District of Northern California
# San Francisco Division

*******************************************

Rev. Josephenie E. Robertson, M.T.T., individually
and as the Representative, Officer and  Matriarch
of the Traditional Authority and Miskitu Govern-
ment-In-Exile; Nehemiah Fleurima an American
born Miskitu Descendant; Mazhane Keairra Ruth
Hendy Rima-Fleurima, an American born Miskitu
Descendant; Ercell Hendy Twaska Fleurima, an
American resident of Miskitu Descendant and
Traditional Authority; Plaintiff Katiana Hebbert, an
American born Miskitu Descendant; Plaintiff Rev.
Gregorio Moody Chow, a Miskitu Descendant;
Plaintiff Prince Jorge G. Moody Chow, a Miskitu
Descendant; Plaintiff Blessings Robertson-Winn, an
American citizen and Miskitu Descendant; Plaintiff
Gloria Watson Hebbert, an American and a Miskitu
Descendant; John Doe 1 and Jane Doe 1 are
Traditional Royal Authorities and representatives
of the Miskitu nation  and non-American citizens;
on behalf of themselves; And all other Miskitu
indigenous peoples.

*Plaintiff(s),*

v.

The Republic of Nicaragua, Daniel Ortega, Rosario
Murillo, and the Sandinista Party;
*Defendants.*

*******************************************



CV    17    0852

JCS

Civil Case No.

CLASS ACTION COMPLAINT

Jury Trial Demanded

1

**Plaintiffs, by and through their attorney(s), (Lawyer's Name), bring this Class Action Complaint against Defendants the Republic of Nicaragua, Daniel Ortega, and the Sandinista Party as follows:**

### SUMMARY OF THE COMPLAINT

1. Plaintiffs bring this action on behalf of all the Miskitu peoples (12 tribes) for damages resulting from the horrific genocide and unlawful taking of property in violation of international law by the Nicaraguan colonial authorities during the times periods from 1850 to the present day period in what was formerly known as the Miskitu Kingdom (Mosquito Coast), and is now known as the North Caribbean Coast Autonomous Region (RACCN) and the South Caribbean Coast Autonomous Region (RACCS) since 2014. Plaintiffs also bring this action to, among other things, enjoin and restrain The Republic of Nicaragua from continuing to exclude plaintiffs and other lawful representatives of the Miskitu people from participation in discussions and negotiations regarding the subject matter of this Complaint, in violation of plaintiffs' rights under international law, including the U.N. Declaration on the Rights of Indigenous People to self-determination for all indigenous peoples and their right to participate and speak for themselves regarding all matters relating to the losses that they have suffered.

2. From 1839 to the present day, almost all of the Miskitu territories and kingdom (originally over 62,750 square miles)[1] with only three Miskitu enclaves under international treaty protection enclaves[2] which have been reduced in size to approximately 1.1 million hectares in Honduras, with approximately 12,000 square miles and 17,000 square miles designated by Nicaragua as the Autonomous Miskitu departments that is tantamount to almost 55% of Miskitu territory illegally annexed by Central American nations with no compensation to the Miskitu people. Countless concessions have been made for international mineral and oil companies along with other natural resources of logging and fishing rights to the present day property seizures and forced relocations of the Miskitu peoples to make way for a canal that have been seized without compensation by the Nicaraguan government, in association with

---

[1] **Statistics of the Colonies of the British Empire (page 137) by Robert Montgomery Martin (1839)**

[2] **Bakinasta in the Río Plátano Biosphere Reserve (RPBR) in northeastern Honduras and the North Caribbean Coast Autonomous Region (RACCN) and the South Caribbean Coast Autonomous Region (RACCS)**

2

international corporations, other international governments and Nicaraguan colonists with the explicit consent of the Daniel Ortega, the Sandinista Party and Nicaraguan authorities. Since fishing, farming, and cattle grazing are the primary economic base for their survival, the Miskitu communities have suffered severely from these terrible losses.  Nicaraguan authorities have also turned a blind eye to the widespread and systematic rape of Miskitu women and girls, as well as the indiscriminate use of Miskitu peoples being used as forced laborers such as in the fisheries, subject to brutal beatings and other deprivations without being afforded compensation, notwithstanding being denied medical treatment and adequate food to sustain themselves and families.

3. A letter from Simon Orosco to Frederick Chatfield (10 November 1842) in Vega Bolanos, 1840-1842, 317,underlying British arguments at the time was the assumption that the Miskito, though perhaps savages, were a sovereign people, who deserved to be taken seriously as political partners. This view not only accorded with British interests at that time, but could also be justified by historical traditions concerning relations between Miskito and British colonial officers, soldiers, and traders. In order to undermine these notions it was necessary for the USA and the countries of Central America to demonstrate that the Miskito were not in a position to decide on their own fate and that they could therefore not be considered parties to a treaty. The anti-British side therefore tended to depict a primitive, cruel tribe manipulated by Great Britain for her own purposes, whose chief had been dressed up by the British as a "puppet king."[3] The British "indirect rule" in a similar manner, regarding international alliances and territories was common practice of the Europeans and U S to demean anyone and any sovereignty that they could not control.

4. In 1850 the United States and Great Britain signed the Clayton-Bulwer Treaty as a pledge to a neutralized Central America. The U.S. interpretation was that Britain would be required to renounce itself as a protectorate over the Mosquito Coast. The British position was that the treaty recognized the existing status quo. The Hay-Pauncefote Treaty of 1900-1901 was to supersede the Clayton-Bulwer Treaty but Congress failed to ratify the treaty.

---

[3] **Wunderich, von Oertzen, and Rossbach, The Nicaraguan Mosquitia, 26.**

5. In 1860 the Treaty of Managua was signed as an agreement between Great Britain and Nicaragua, in which Britain recognized Nicaraguan sovereignty over its present national territory, but reserved, on the basis of historical rights, a self-governing enclave for the Miskito, an indigenous group in the area, citing earlier treaty arrangements and historical circumstances. The British maintained their right to negotiate on behalf of the Miskitu people on the basis of their doctrine of "indirect rule". The Treaty of Managua contained a clause requiring the consent of the Miskitu in order for any incorporation of the Miskitu Reserve into Nicaragua to take place that afforded some self-government rights on paper even after 1894.

6. The British did not seek out participation of the Miskitu people in these negotiations due to the Miskitu people rejecting the Anglican Church in favor of the Moravian church as their state religion due to their doctrine of "indirect rule". The mind set of discriminatory and racists policies of the "era" is also shown by France's refusal to negotiate on behalf of Nicaragua because, "European nations cannot, without demeaning themselves, negotiate with those little Mosquitian governments,..." [4]

7. And, in a very similar manner the Nicaraguan Congress and government correspondence referred to the Miskitu as incapable of governing themselves, animals and barbarians. In 1847 it is documented that Nicaragua's President argued that the British takeover of San Juan del Norte would now serve as a model for "the savage hordes of any country under the protection of a strong Power to consider themselves with the same right to constitute a nation." [5] The Defendants continue to follow these discriminatory and racist government policies to the present date.

8. In 1867, the Republic of Nicaragua refused to comply with the Treaty of Managua because "the last election of the Mosquito Chief was carried out: first, by foreigners and Creoles without

---

[4] Cited in Gamez, Historia de Nicaragua, 425
[5] Proclamation enclosed in a letter from Frederick Chatfield to Lord Palmerston, 24 December 1847, in United Kingdom, Foreign Office, Correspondence Respecting the Mosquito Territories, 2:70.

the co-operation of the Indians; and secondly, against the desire of these Indians, who wish to be governed by a bastard son of the last Mosquito Chief." [6]

9. On July 2, 1881 the terms of the Treaty of Managua were adjucated by the Emperor of Austria providing numerous protections to the Miskitu peoples.[7]

10. In 1894, Nicaraguan President Jose Santos Zelaya Lopez took control of the Miskitu Coast by military force. Under threats of force the Miskitu were compelled to sign the Miskitu Convention of 1894 yet in defiance, the Miskitu reiterated the rights of the Miskitu to elect their own authorities, be exempt from taxes and military service, and benefit from the proceeds of all taxes extracted from their region.

11. His Excellency the beloved Prince Robert Henry Clarence was the last hereditary Chief to rule the Miskitu peoples. He was born at Rama Cay, Bluefields' Lagoon, on the 6th day of September 1872. He was the son of H.E. Prince William Henry Clarence, the Hereditary Chief of Miskitu, by a lady from Rama. He was proclaimed the Hereditary Chief of Miskitu following an election by the General Council, on 29th January 1891 (effective from the 11th of November 1890). He was crowned at Pearl City, 24th March 1891. He reigned under the guardianship of the Hon Charles Patterson, Vice-President of the Council, until he came of age and assumed full ruling powers on 6th September 1893. He was deposed on the 12th of February 1894, after Bluefields was invaded at night when the townspeople were asleep. The Nicaraguan seized the Miskitu government archives and government buildings. The occupying Nicaraguan troops proclaimed him and the Miskitu government rebels. He was rescued and given asylum along with 200 other refugees aboard a British ship that sailed to Puerto Limon and then on to Jamaica.

12. Later, Robert Henry Clarence was restored after British intervention induced them to retire in 6th July 1894. Deposed again after a second invasion, when all American and British residents were forcibly removed to Managua and the town of Bluefields was reduced to 500 residents on

---

[6] See Memorandum and letter from Marshal Martinez, envoy extraordinary and minister plenipotentiary of the Republic of Nicaragua, to Lord Stanley, Britain's Foreign Minister, 1 October 1867, in United Kingdom, Foreign Office, and Correspondence Respecting the Mosquito Territory, 3:77.
[7] http://legal.un.org/riaa/cases/vol_XXVIII/167-184.pdf

the 7th of August, 1894. The Chief was repeatedly petitioned by his countrymen to return to the Miskitu Coast and resume his reign, being regarded by them throughout his exile as their "rightful King", and in whose favor at least three rebellions were mounted against the Nicaraguan government. Prince Robert Henry Clarence was the Colonel-in-Chief of the Royal Bluefields Militia from 1890-1894. He married Irene Morrison. He died after an operation at the Public General Hospital, Kingston, Jamaica, on the 6th of January 1908 and is buried there. The Nicaraguan government agreed to allow him to return but that he could not participate in self-government.

13. The Republic of Nicaragua renamed the Miskitu region as the Zelaya Department after their President Jose Zelaya. The British under their international doctrine signed a treaty on behalf of the Miskitu kingdom to protect the Miskitu indigenous rights.

14. In 1905 the Harrison-Altamirano Treaty 1905 Nicaragua and Great Britain entered another agreement that supersedes the Treaty of Managua and similarly guaranteed Miskitus born before 1894 the right to exempting from taxes and military service for a period of fifty years, and to live according to their own customs as long as those customs did not contradict Nicaraguan laws and granted the same rights guaranteed all Nicaraguans. The Republic of Nicaragua has never honored the right to self-government, equal rights or the right of the Miskitu lawful representatives to participate in the negotiations.

15. In December of 1909 to 1933, the United States of America sent interventionary forces into the Miskitu city of Bluefields to create a neutral zone between the Nicaraguans and Miskitu peoples.

16. In 1957, the Plaintiff Josephenie E. Robertson, M.T.T.'s family was destroyed when her brothers and uncles were killed by the Somoza Nicaraguan Government and by the order of the Miskitu Council of Elders and her family, she was appointed to take staff as the traditional authority of the Miskitu peoples. She traveled from town to town proclaiming the full rights and independence of the Miskitu nation. She was arrested and sent to jail in Managua, where she was treated cruelly. She was arrested again in 1960 under government orders and was put in

front of a firing squad. She was given the option to be exiled permanently, imprisoned indefinitely or face death.

17. From 1894 to present, the Nicaraguan governments have murdered, recruited, threatened, bribed, or exiled Miskitu leaders and members of the Royal family trying to keep the majority of the people oppressed. They would prefer the Miskitu people to have no sense of ancestry, dignity, or history. She chose to be exiled so that she could continue fighting for her people. She was given 72 hours to leave my remaining family and friends in Mosquitia/Miskitu and fled to Guatemala.

18. In 1957, in order to divide the Miskitu peoples and unlawfully seize Miskitu territory, to secure full control of the San Juan river and a future potential for the construction of an inter-oceanic canal, the Republic of Nicaragua seized part of the Miskitu Coast (Zelaya Department) by partitioning the southern portion of the Miskitu kingdom and renaming it the Rio San Juan Department.

19. In August of 1981, the government issued its own conception of indigenous rights. Article 6 of its "Declaration of Principles" states that *"the natural resources of our territory are the property of the Nicaraguan people. The Revolutionary State, representative of the popular will, is the only entity empowered to establish a rational and efficient system of said resources. The Revolutionary State recognizes the right of the indigenous people to receive a portion of the benefits to be derived from the exploitation of forest resources of the region. These benefits must be invested in programs of community and municipal development in accordance with national plans."*

20. In 1987 Nicaragua continued to partition and divides the Miskitu peoples by splitting the Zelaya Department into two autonomous regions they called, (RACCN) North Caribbean Coast Autonomous Region and (RACCS) South Caribbean Coast Autonomous Region.

21. In 2001, the Miskitu sub-division prevailed over Nicaragua in the Inter-American Court of Human rights where the Republic of Nicaragua failed to address that court's findings affording

.

.

no relief whatsoever. Case of the Mayagna (Sumo) Awas Tingni Community v. Nicaragua Judgment of August 31, 2001. [8]

22. The Atlantic Coast registers the highest rate of migrant population growth in Nicaragua and this is attributed to a net increase of Mestizo families that systematically settle in the agricultural frontier zones. One third (33.3%) of the total population of the Atlantic Coast is established in urban communities and the other two thirds (66.7%) in rural zones. The Mestizo (Colonos) is responsible for seizing Miskitu lands, farms, and territories for the purpose of colonization with no compensation.

23. The Defendants pursue a policy of education deprivation for the Miskitu people. The rate of illiteracy among the population 10 years or older is 43 percent. Illiteracy is more widespread in the rural areas, where this percentage rises to 55 percent, with an even higher rate among the female population. The rate of illiteracy for the country as is whole is 24.5 percent.

24. The Defendants maintain a policy of force labor and deprivations of a means of family support. Three fourths (73.6 to 75%) of the population of the Nicaraguan Caribbean Coast lives in situations of poverty and extreme poverty. The employed workforce earns very low wages that merely cover half the of cost of the basic consumer basket. As much as 80 percent of an average salary on the Coast is destined to the purchase of food items. [9]

25. The Republic of Nicaragua represented by the government regime of Anastasio Somoza Debayle prevailed with and engaged in practices of torturing, murdering, and abducting citizens. [10]

26. In late 1981 with CIA funding and Argentine advisers, the "covert war" began. [11] The Miskitu peoples allied themselves with the Contras after the Sandinistas refused direct negotiations with the traditional Miskitu authorities by requiring the Miskitu people to create "on the spot" political organizations that would work under the control of the Sandinistas. From mid-1981 to

---

[8] Please find this case at: http://www.corteidh.or.cr/docs/casos/articulos/seriec_79_ing.pdf

[9] Please review: http://www.fadcanic.org.ni/?q=node/17

[10] Americas Watch, Human Rights in Nicaragua; November 1982 Update (New York; Americas Watch, November 1982.

[11] Washington Post, February 14, 1982

1982 the Sandinistas began s large scale of forced relocations of thousands of Miskitu peoples out of their traditional villages while systematically destroying Miskitu homes and livestock and up to another 15,000 Miskitu refugees fled to the safety of Honduras. The USA CIA with its funding, training, supplying and support built an insurgent fighting force called, MISURA made up of recruiting refugees and the exiled leadership that was separate from but allied with the Contra forces. The Nicaraguan Revolution resulted in the deaths of thousands of Miskitu peoples, with the remainder thrown into forced relocation camps were placed under atrocious and sub-human conditions, and were forced to work as forced/slave laborer. The surviving women were subjected to systematic rapes and other abuses.

27. After decades of denying that the methodical and systematic near destruction and eradication of the Miskitu peoples by the Defendants was, in fact, a genocide, and refusing to even consider the issue of reparations or compensation, Defendant The Republic of Nicaragua recently entered into negotiations with the Miskitu Sumo regarding these issues. However, the Republic of Nicaragua has refused to include the traditional representatives of the Miskitu peoples in these discussions, even though they were the primary victims of the atrocities perpetrated by the Republic of Nicaragua past and present governments. The Republic of Nicaragua has also refused to explicitly admit that what it did constitutes a genocide and torture under international law and continues with this systematic elimination of the Miskitu peoples and seizing their natural resources up to the present day.

28. The Defendants Republic of Nicaragua, Daniel Ortega, **Rosario Murillo** and the Sandinista Party have continued previous policies up to the present day of 2017; of exterminating the Miskitu people and their inherent rights to their natural resources, lands, waters, forests, farms and livestock by entering into negotiations with China for the construction of a canal through Miskitu territories and the Russian Federation for naval and air force bases and international businesses with concessions of Miskitu minerals, oil, and other natural resources without any compensation. The result of these deprivations has been that the Miskitu peoples are forced from their farms, and homes with no compensation or domicile to live, are denied medical and educational services, forced into slave labor situations to fish and turn over their catch to the

government without adequate subsistence for their families. Men, women and children are murdered by Nicaraguan Colonos (colonists), while many Miskitu women and girls are systematically raped.

29. The U.S. and Miskitu plaintiff representatives of the Miskitu communities bring this class action complaint on behalf of all Miskitu peoples (Twelve Miskitu tribes) worldwide, seeking reparations and compensation for the genocide and incalculable damages to persons and property that their peoples suffered at the hands of the previous Nicaragua colonial authorities, as well as the continuing violations by the Republic of Nicaragua, Daniel Ortega, and the Sandinista Party of the rights of the Miskitu peoples under the U.N. Declaration on the Rights of Indigenous People to directly participate in any discussions or negotiations relating to them.

30. The U.S. and Miskitu plaintiff representatives of the Miskitu communities also bring this action, pursuant to 28 U.S.C. § 2201 (The Declaratory Judgment Act) seeking a Declaration of their Rights to be included in any negotiations between the Republic of Nicaragua, Daniel Ortega, and the Sandinista Party in conjunction with China, Russia, other international nations and businesses and that no purported resolution of the claims as set forth herein can be made, nor will they be binding upon the Miskitu communities and their members, if the Republic of Nicaragua, Daniel Ortega and the Sandinista Party in conjunction with other international nations and businesses exclude them from negotiations and unless their competent representatives are  signatories to any settlements, treaties or release of claims.

## PARTIES

31. Plaintiff Rev. Josephenie E. Robertson, M.T.T. is the Matriarch of the Miskitu Nation, Miskitu Peoples (Twelve Tribes) and a traditional royal representative of the Miskitu Government-in-Exile, which is the sole recognized legal entity representing the overwhelming majority of the Miskitu peoples in Nicaragua and worldwide.

32. Plaintiff Nehemiah 'Saycsar' N.D.D.Z.Z. Robert Henry Hendy Clarence XXI Rima-Fleurima, Prince of the arriving Community Nation of Moskitia – American born citizen and Miskitu Descendant.

10

33. Plaintiff Mazhane Keairra Ruth Hendy Rima-Fleurima, an American born citizen and Miskitu Descendant.

34. Plaintiff Katiana Hebbert, an American born citizen and Miskitu Descendant.

35. Plaintiff Rev. Gregorio Moody Chow, a Miskitu Descendant.

36.  Plaintiff Prince Jorge G. Moody Chow, a Miskitu Descendant of the "De Mosque Dynasty."

37. Plaintiff Ercell Hendy Twaska Fleurima, a lawful American permanent resident and Miskitu Descendant and Traditional Royal Authority representing Miskitu Elders, SWARAH and MISURA.

38. Plaintiff Blessings Robertson-Winn, an American Citizen and Miskitu Descendant.

39. Plaintiff Gloria Watson Hebbert, an American Citizen and a Miskitu Descendant.

40. John Doe 1 is a traditional royal authority and representative of the Miskitu nation and non-American citizen. The identity of John Doe 1 is withheld at this time to assure his safety and will be provided upon judicial request.

41. Jane Doe 1 is a traditional royal authority and representative of the Miskitu nation and non-American citizen. The identity of John Doe 1 is withheld at this time to assure her safety and will be provided upon judicial request.

42. Defendant the Republic of Nicaragua ("Nicaragua") is a sovereign state and a federal representative democratic republic reconstructed and governed by Daniel Ortega, Rosario Murillo and the Sandinista Party as a result of a civil war, which is responsible for the genocide of the Miskitu peoples being the successor to the Spanish establish form of Nicaraguan government established in 1821 and continued to President Anastasio Somoza Debayle's overthrow in 1979. Defendants Republic of Nicaragua, Daniel Ortega, Rosario Murillo and the Sandinista Party engaged in the taking and expropriation of Miskitu territories, lands, natural resources, waters, livestock, and other property without compensation in violation of international law are named individually and jointly.

43. Defendant the Republic of Nicaragua is a member of the United Nations and a party to the Convention on the Prevention and Punishment of the Crime of Genocide ("Genocide Convention"), which was adopted by the General Assembly of the United Nations on December 9, 1948, and which became effective on January 12, 1951. Defendant Republic of Nicaragua acceded to the convention on the prevention and punishment of the crime of genocide, when said Defendant deposited its government's instrument of accession to the "treaty" on January 29, 1952 as the 33rd state to ratify, accede or accept the convention on genocide. Nevertheless, the Republic of Nicaragua, Daniel Ortega, and the Sandinista Party have denied that its mistreatment of the twelve tribes of the Miskitu peoples constitutes a genocide, even though the factual and historical record clearly reflects that the Defendant's conduct falls squarely within the generally accepted and statutory definition of genocide.

44. In addition, the Republic of Nicaragua voted for and is a signatory to the U.N. Declaration on the Rights of Indigenous Peoples, adopted by the U.N. General Assembly on September 13, 2007 ("Declaration"), which explicitly provides, at Article 11 (2):

*States shall provide redress through effective mechanisms, which may include restitution, developed in conjunction with indigenous peoples, with respect to their cultural, intellectual, religious and spiritual property taken without their free, prior and informed consent or in violation of their laws, traditions and customs.*

In addition, Article 18 of the Declaration provides as follows:

*Indigenous peoples have the right to participate in decision-making in matters which would affect their rights, through representatives chosen by themselves in accordance with their own procedures, as well as to maintain and develop their own indigenous decision making institutions.*

Nevertheless, despite the incalculable cultural, intellectual, religious and spiritual losses that the Miskitu peoples have suffered, the Republic of Nicaragua, Daniel Ortega, and the Sandinista Party has systematically and categorically excluded the lawful representatives of the indigenous Miskitu peoples established under the following doctrines and international treaties, including but not limited to, the 1860 Treaty of Managua, that recognized the Miskitu monarchy as the lawful representatives from negotiations between the Republic of Nicaragua,    other

international nations, businesses, and entities relating to their horrific mistreatment during the colonial period, subsequent Nicaraguan governments, during civil wars and to the present day, with to Miskitu representation in international governments and businesses negotiations where they has steadfastly refused to even consider making any reparations or compensation to the Miskitu peoples for the catastrophic losses that they have suffered and are suffering.

## JURISDICTION AND VENUE

45. This Court has subject matter and jurisdiction over this matter pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship between the parties.

46. This Court also has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331, in that the genocide and unlawful takings claims under international law asserted herein arise under 28 U.S.C. § 1350 (Alien Tort Statute) and, in the case of the plaintiffs who are U.S. residents and citizens, under federal common law, which incorporates international law.

47. This Court has jurisdiction pursuant to The Torture Victim Protection Act of 1991 (TVPA; Pub. L. 102–256, H.R. 2092, 106 Stat. 73, enacted March 12, 1992) is codified at note following 28 U.S.C. § 1350 (2006); that is, in a note immediately following the codification of the Alien Tort Statute. In contrast with that latter statute – which, as discussed supra § III.E.1, refers broadly to "a tort … committed in violation of the law of nations or a treaty of the United States" – the Torture Victim Protection Act provides a civil remedy for just two international law torts. Those two torts are: Torture and Extrajudicial killing.

48. This Court further has jurisdiction pursuant to Smith v. Socialist People's Libyan Arab Jamahiriya, 886 F. Supp. 306, 315 (E.D.NY1995). Also in Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir. 1980), the Second Circuit's landmark 1980 decision in Filartiga v. Pena-Irala, which held that victims of human rights abuses in other countries could use the statute to sue the perpetrators of the abuse in U.S. courts in association with the Court's inherent power of discretion ad further sustained in Sosa v. Alvarez-Machain, 542 U.S. 692 (2004); Id. at 729. In that case, a Mexican citizen was suing another Mexican citizen for the latter's involvement in a kidnapping that occurred in Mexico at the behest of the U.S. government. The Court held that a "narrow

class of international norms today" could be brought under the ATS, subject to "vigilant door keeping" by the lower courts. And finally in support of jurisdiction and the Court's inherent power of discretion, I respectfully submit that an American Court can concern itself with aliens outside of the United States if there is "torture, brutality or similar outrageous conduct." Lujan v. Gengler, 510 F.2d 62, 65 (2d Cir.), cert. denied, 421 U.S. 1001 (1975). Comity affords U.S. Federal prosecution.

49. This Court also has subject matter and personal jurisdiction over defendants the Republic of Nicaragua, Daniel Ortega, and the Sandinista Party under the Foreign Sovereign Immunities Act, since this case involves genocide and an unlawful taking and expropriation of property without compensation in violation of international law. 28 U.S.C. § 1605(a)(3). It is undisputed that genocide itself is a violation of international law. See, e.g., Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 791 n.20 (D.C. Cir. 1984) (Edwards, J., concurring); accord, Abelesz v. OTP Bank, 692 F.3d 638 at 675-76 (7th Cir. 2012). The Restatement (Third) of the Foreign Relations Law of the United States § 712(1) states that, as here, a country (state) is responsible under international law for injury resulting from a taking by the state of the property of a national of another state that (a) is not for a public purpose, or (b) is discriminatory, or (c) is not accompanied by provision for just compensation.

50. Congress has also authorized aliens to bring federal common law tort actions in federal courts for violations of the law of nations to avoid the diplomatic problems that may otherwise result from adjudication of these civil claims in state courts. See, e.g., Anne-Marie Burley [Slaughter], The Alien Tort Statute and the Judiciary Act of 1789: A Badge of Honor, 83 Am. J. Int'l L. 461, 481-82 (1989); William R. Casto, The Federal Courts' Protective Jurisdiction Over Torts Committed in Violation of the Law of Nations, 18 Conn. L. Rev. 467, 468-69 (1985-1986); and 2 Emmerich de Vattel, Law of Nations, ch. 6 §§ 71-72 (Joseph Chitty, trans. and ed., T. J. W. Johnson & Co. 1867) (1758) (the law of nations provides a private remedy for foreigners injured by violations of international or domestic law and is an essential means of reducing friction between nations.). Therefore this Court has jurisdiction pursuant to 28 U.S. Code § 1605A(6)(7)

- Terrorism exception to the jurisdictional immunity of a foreign state and 18 U.S. Code § 2333(a) - Civil remedies.

51. In addition, the takings of property alleged herein has a sufficient connection to genocide such that they amount to takings "in violation of international law."  28 U.S.C. § 1605(a)(3).  Indeed, the alleged takings did more than effectuate genocide or serve as a means of carrying out genocide. See Abelesz, 692 F.3d at 675-76.  Rather, the expropriations were themselves genocide. Since the wrongfully taking of Miskitu properties was inextricably linked to the mass killings and genocide of these peoples, plaintiffs' property-based claims fall squarely within the FSIA's expropriation exception.  See Phoenix Consulting Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000).  Such expropriations, therefore, constitute "tak[ings] in violation of international law."  28 U.S.C. § 1605(a)(3).

52. The legal definition of genocide thus unquestionably encompasses the mass extermination and systematic expropriation of Miksitu lands, waters, natural resources, livestock and other property alleged in this case.  The Convention on the Prevention of the Crime of Genocide (Genocide Convention), art. 2, Dec. 9, 1948, 78 U.N.T.S. 277, adopted by the United Nations in the immediate aftermath of World War II and ratified or acceded to by nearly 150 nations (including the United States), defines genocide as follows:

*[A]ny of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such: (a) Killing members of the group; (b) Causing serious bodily or mental harm to members of the group; [or] (c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part . .*
.

53. This definition of genocide is "generally accepted for purposes of customary [international] law."  Restatement (Third) of the Foreign Relations Law of the United States §702 cmt. d. It appears not only in the Genocide Convention itself, but also in numerous other international treaties. See, e.g., Rome Statute of the International Criminal Court art. 6, July 17, 1998, 2187 U.N.T.S. 90; Statute of the International Tribunal for Rwanda art. 2 (1994); Statute of the

15

International Criminal Tribunal for the Former Yugoslavia art. 4 (1993).  The offense of genocide under U.S. domestic law uses the same definition.  See 18 U.S.C. § 1091(a).

54. This Court also has personal jurisdiction over the foreign defendant pursuant to Fed. R. Civ. P. 4(k)(2).

55. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over claims brought under the common law and laws of the State of California.

56. Venue properly lies in this Judicial District pursuant to 28 U.S.C. §1391(b) and (c). Furthermore, there is no foreign independent or impartial forum in which to bring this action.

## STATEMENT OF FACTS

57.  Plaintiff Rev. Josephenie E. Robertson, M.T.T. states that I was granted refugee status by the United States of America from the turmoil that evolved in the Miskitu Kingdom since 1898 on a continuous manner until the present day. I am a member of the Miskitu Royal Family and is also known among my people as the Matriarch of the Miskitu Nation. I am also a present member of the Miskitu Government in-Exile, which is now located in the United States.

58.  Plaintiff Rev. Josephenie Hendy Hebbert Clarence Tawaska De- Robertson, states I am the Matriarch of the Miskitu Nation, was born in Silver City, Mosquitia on December 10th, 1943. I grew up with my mother, the Crown Princess of Miskitu Nation and father, originally from Sudan. Her parents and the elders taught me the oral history of our nation (in the past, my grandfather, Sir. Andrew Hebbert Sumito Sumu, had a library containing books on the history of the nation but Somoza had it burned down. My home was filled with love and respect--a stark contrast to the oppression and neglect by ruling governments both in Nicaragua and Honduras.

59.  My mother was a midwife and holistic healer who traveled from town to town helping those in need. She was a homeopathic practitioner, who learned from her mother, the natural remedies created from herbs, barks, berries, vines, trees, roots and other flora. She knew the correct combinations and required mixtures for curing people just like her mother did. She also loved to read, write, and sing. Her family is the heirs of the Miskitu Kingdom. We have rightful

claims to all its mineral resources such as gold, silver, pearls, mahogany, cedar, rubber, and lumber.

60.    In 1957 my brothers and uncles were killed by the Somoza Nicaraguan Government and by the order of the Council of Elders and family I was appointed to take staff.  From town to town I proclaimed the full rights and independence of my nation. I was arrested and sent to jail in Managua, where I was with treated cruelly. Rather than deterring my efforts, it deepened my conviction and I continued awakening my people to their rights.

61.  I was arrested again in 1960 under government orders and was put in front of a firing squad. I was given the option to be exiled permanently, imprisoned indefinitely or face death.

62. From 1894 to present, the Nicaraguan governments have murdered, recruited, threatened, bribed, or exiled Miskitu leaders and members of the Royal family trying to keep the majority of the people oppressed. They would prefer the Miskitu people to have no sense of ancestry, dignity, or history. I chose to be exiled so that I could continue fighting for my people. I was given 72 hours to leave my remaining family and friends in Mosquitia/Miskitu. I fled to Guatemala.

63. The Miskitu peoples and Council of Elders maintain communications with me, informing me on the horrible conditions and terrible plight of our Peoples in Honduras and Nicaragua. Being informed that our people are being forced from their homes by Colonos; Chinese people are without notice coming into their homes; our Miskitu men being murdered and our women and girls being raped while still being denied medical treatment and food, our Miskitu Government in-Exile in association with some American churches sent humanitarian aid to our people in 2016. Our Council of Elders report that the Defendants are providing concessions to Miskitu natural resources from Canadian, American, Norwegian and Chinese businesses with no compensation to our Miskitu peoples.

64. Plaintiff Jose Miguel Coleman Hendy Clarence states that the day January 15, 1983 a 19:00 a military truck arrived it was the Sandinista Popular Army EPS to take me out my house in an authoritarian and violent way. They did not respect the pleas and cries of my mother. I told

them was the sole breadwinner of the house. They did not care. I was then led to a military base Luis Delgadillo. There I found they already had a hundred and Twenty Miskitus, Gurifanas, Creoles, Sumus, Ramas from ages 16-50. They were Young Students, Sandinista State Workers, Farmers, etc. For us it was strictly forbidden to ask where we were going. They had Cuban Military, Russians and Polish who measured our clothes, boots, EVEN coffins. In the morning we mounted on other trucks and taken to unknown directions. Finally, we got a military camp where was divided into five brigades. I was placed in the medical brigade, as a soldier and server. They armed themselves with rifles M-18. They tortured and brain washed us against the contra revolucionarios they said they were our mortal enemies whether they were Miskito, Sumo, Rama, Gurifana, Creole, Americanos, Father, Mother, Brother, or relative. Anyone opposite of the Sandinista Ideology or would not join. One Bolar lead was ESE our slogan. A week to see come was an ambush that killed 6 of our brigade that was the most sad and painful that I experienced in my life I spent over 90 Days in the mountains. Thank God I'm alive to tell this story.HRH. Principe. Jose story HENDY Clarence Coleman.

65.   The Miskitu Council of Elders has continually sought lawful government contact and communications with the Miskitu royal family and government in exile to the present day.

66. The Republic of Nicaragua, represented by Daniel Ortega, and the Sandinista political group, have continually ignored the lawful Miskitu government, nor has consulted with the Miskitu government in exile with respect to the basic human rights of the Miskitu peoples. Instead, they appoint their own people to councils claiming Miskitu representation while at the same time, appropriating land and the natural resources of the Miskitu people. These acts have been and are accomplished by forced relocations of people and villages with no accommodations or compensation, rape, murder, torture, genocide, and withholding medicines and food. The United States afforded military aid to the Miskitu people in protection of their basic human rights during the Contra-Sandinista war. Yet, while insisting on a peace treaty, that treaty has not addressed any grievances of the Miskitu people nor afforded its lawful government to address those grievances and protect the Miskitu people under the international treaties regarding the Miskitu kingdom.

67. The Republic of Nicaragua presently is compelling the Miskitu people under duress to sign documents of compensation payments from the government in the payment of pigs, chickens and lumber.

68. The Miskitu government in exile this year 2016 delivered humanitarian aid to the Miskitu peoples while encountering extreme difficulties by the Nicaraguan government who were concealing the atrocities now being implemented against the Miskitu peoples.

## CLASS ACTION ALLEGATONS

69. Plaintiffs are U.S. citizens and aliens who bring this action on behalf of themselves and all other U.S. and non-U.S. citizens who are, or who are direct descendants of, and members of the Miskitu (12 tribes) indigenous peoples.

70. This action may be properly maintained as a Class action pursuant to Rule 23, Federal Rules of Civil Procedure, in that the exact number of the members of the Class is not known to Plaintiffs but it is estimated that the Class is so numerous that joinder of individual members herein is impracticable. This action may be properly maintained as a Class action pursuant to Fed. R. Civ. P. Rule 23(b)(1) in that the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests. This action may be properly maintained as a Class action pursuant to Fed. R. Civ. P. Rule 23(b)(2) as the parties opposing the Class have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

71. There are also questions of law and fact common to the Class which predominates over questions affecting individual members, including:

(a) Did the Republic of Nicaragua colonial authorities, subsequent Nicaraguan governments, Daniel Ortega, and the Sandinista Party design and implement an intentional policy and practice to exterminate the Miskitu people?

19

(b)  Did the Republic of Nicaragua colonial authorities, subsequent Nicaraguan governments, Daniel Ortega, and the Sandinista Party systematically expropriate, and aid and abet the expropriation, of Miskitu lands, territories, natural resources, waters, livestock and other properties?

(c)  Did the Republic of Nicaragua colonial authorities, subsequent Nicaraguan governments, Daniel Ortega, and the Sandinista Party implement, aid and abet, and authorize a policy and practice of systematic rape of Miskitu women and girls?

(d)  Did the Republic of Nicaragua colonial authorities, subsequent Nicaraguan governments, Daniel Ortega, and the Sandinista Party implement, aid and abet and authorize a policy and practice of forcing Miskitu men, women and children into involuntary servitude and forced/slave labor?

(e)  Did the Republic of Nicaragua colonial authorities, subsequent Nicaraguan governments, Daniel Ortega, and the Sandinista Party incarcerate the surviving Miskitu people into concentration camps under inhumane and sub-human conditions, without adequate food, water, clothing, shelter, medical care and other basic requirements and tools for survival, at Tasba Pri, Sangilaya and other "relocation" centers also known as "concentration" camps?

(f)  Did the Republic of Nicaragua colonial authorities, subsequent Nicaraguan governments, Daniel Ortega, and the Sandinista Party permit and aid and abet the public display of Miskitu corpses and skulls in a misguided and ghoulish effort to establish that indigenous Miskitu peoples were "incapable of governing themselves" as (inferior or barbarians humans) and that the Spanish heritage was superior?

(g) Has the Republic of Nicaragua colonial authorities, subsequent Nicaraguan governments, Daniel Ortega, and the Sandinista Party intentionally "marginalized" and excluded Miskitu leadership and representatives from any negotiations regarding the genocide and wrongful expropriation of their property, natural resources, livestock, waters, and territories in violation of the U.N. Declaration of the Rights of Indigenous Peoples?

72. The claims of the named Plaintiffs are typical of the members of the Class and they will be able to fairly and adequately protect the interests of the Class. The named Plaintiffs have no interests antagonistic to the interests of other members of the Class.

## COUNT I
### (Violations of International Law Under the Alien Tort Statute and The Torture Victim Protection Act of 1991, 28 U.S.C. § 1350, Federal Common Law and The Law of Nations)

73. Plaintiffs repeat, reallege, annex, apply, and absorb the foregoing paragraphs of this Complaint as though fully set forth herein.

74. The Republic of Nicaragua, President Ortega, and the Sandinista Party's horrific mistreatment of the Miskitu peoples during the Nicaraguan colonial period to the present day, including but not limited to the mass killings intended to exterminate the Miskitu peoples, the systematic rape and abuse of Miskitu women and girls, the taking and expropriation of lands, territories, natural resources, waters, livestock, and other property without compensation and in furtherance of said Defendant's genocidal policies, including the December 1981 herding and forcibly relocation of Miskitu survivors into concentration camps, the exploitation of surviving Miskitu people as forced/slave laborers, and the use of Miskitu corpses and skulls for public display, constituted genocide under international law.

75. In addition, The Republic of Nicaragua, as the lawful governmental authority during the colonial-annexation period of 1860 to 1894, is liable for aiding and abetting Nicaragua settlers, colonists and residents of the Miskitu Kingdom in the confiscation of lands, territories, natural resources, waters, livestock, and other property from the Miskitu peoples in violation of international law, the systematic rape of Miskitu girls and women by said Nicaraguan civilian and military personnel, and the unlawful use of Miskitu men and children as forced/slave laborers.

76. The Republic of Nicaragua, Daniel Ortega, and the Sandinista Party are also liable to plaintiffs and the plaintiff class for its violations of the U.N. Declaration of the Rights of Indigenous Peoples, in that it has refused to recognize that the lawful representatives of the indigenous Miskitu peoples, as defined by international treaties and have a right to participate

in negotiations relating to the genocidal policies and practices of the Republic of Nicaragua authorities during the colonial period, the defendants refusal to recognize the right to self-determination of the Miskitu peoples, and the refusal to even consider the issue of reparations and compensation to the Miskitu for the catastrophic abuses that they were forced to endure.

77. The Republic of Nicaragua, Daniel Ortega, and the Sandinista Party are liable to the non-U.S. plaintiffs and plaintiff class members for damages under the Alien Tort Statute, 28 U.S.C. §1350, and The Torture Victim Protection Act of 1991 (TVPA; Pub. L. 102–256, H.R. 2092, 106 Stat. 73, enacted March 12, 1992), in an amount to be determined at trial.

78. The Republic of Nicaragua, Daniel Ortega, and the Sandinista Party are is liable to the U.S. plaintiffs and plaintiff class members for these violations of international law under federal common law, which incorporates international law, in an amount to be determined at trial.

## COUNT II
### (Conversion)

79. Plaintiffs repeat, reallege, annex, apply, and absorb the allegations as set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

80. The Republic of Nicaragua, Daniel Ortega, and the Sandinista Party's confiscation and unlawful taking of the lands, territory, natural resources, waters, livestock and other property of the Miskitu peoples without compensation constituted a conversion under common law and California state law.

81. The Republic of Nicaragua, Daniel Ortega, and the Sandinista aiding and abetting of the confiscation and unlawful taking of the lands, territory, natural resources, waters, livestock and other property of the Miskitu peoples without compensation by Nicaraguan nationals, colonists and by international concessions to others from the colonial period to the present day constitutes a conversion under common law and California state law.

82. As a result, plaintiffs and all Miskitu members of the Class were deprived of their property, lands, territories, natural resources, waters, livestock and its use and enjoyments, and any interest and provides which could have been earned thereon.

Case 4:17-cv-00852-JST Document 1 Filed 02/21/17 Page 23 of 25

83. The Republic of Nicaragua, Daniel Ortega, and the Sandinista Party are liable to the plaintiffs and plaintiff class for such damages in an amount to be determined at trial.

84. Plaintiffs and other Class members are also entitled to the return of the assets and property that was looted and confiscated directly by the defendant, or which was aided and abetted by the defendant, in an amount to be determined at trial.

## COUNT III
### (Unjust Enrichment)

85. Plaintiffs repeat, reallege, annex, apply, and absorb the allegations as set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

86. By its seizure, international concessions, use and retention of the property, natural resources, waters, livestock looted from the plaintiffs and Class members, through its aiding and abetting of others to convert plaintiffs' property, natural resources, waters, livestock and by its refusal and failure to return said looted assets to their rightful owners, defendant improperly deprived plaintiffs and other Class members of their property.

87. Plaintiffs and other Class members are therefore entitled to recover damages in an amount to be determined at trial.

## COUNT IV
### (Accounting)

88. Plaintiffs repeat, reallege, annex, apply, and absorb the allegations set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

89. Plaintiffs and Plaintiff class members are entitled to an accounting from the Republic of Nicaragua, Daniel Ortega, and the Sandinista Party for the losses that they suffered for the confiscation of their lands, territories, waters, natural resources, livestock and other properties in violation of international law.

## COUNT V
### (Declaratory Judgment)

90. Plaintiffs repeat, reallege, annex, apply, and absorb the allegations set forth in the foregoing paragraphs of this Complaint as though fully set forth herein.

91. Plaintiffs and Plaintiff class members are entitled to an Order declaring that defendant's exclusion of Plaintiffs, as the legitimate and lawful representatives of the Miskitu indigenous peoples, from current negotiations regarding the subject matter of this Complaint, is a violation of Plaintiffs' rights under international law, including the U.N. Declaration on the Rights of Indigenous People.

### JURY TRIAL DEMAND

92. Plaintiffs demand a jury trial on all issues so triable.

WHEREFORE, plaintiffs respectfully request that this Court:

(a) Certify this as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b) Order that the undersigned attorneys are designated as class counsel, until such time as counsel is appointed and/or plaintiffs secure counsel;

(c) Adjudge and decree that defendants' conduct as described herein was in violation of international law, federal statutory and federal common law, and the laws of the State of California, U.S.A;

(d) Enjoin and restrain defendants from continuing to exclude plaintiffs and other traditional and lawful representatives of the Miskitu peoples from participation in discussions and negotiations regarding the subject matter of this Complaint, in violation of plaintiffs' rights under the U.N. Declaration on the Rights of Indigenous People to self-determination for all indigenous peoples and their right to participate and speak for themselves regarding all matters relating to the losses that they have suffered;

(e) Temporarily Enjoin and restrain disbursement of defendants international funds from being released sufficient to cover pending compensation claims trial and remedy, and outcome of this complaint pending a permanent injunction at trial freezing the Republic of Nicaragua international funds until judgment compensation is satisfied.

(f) Award damages to the plaintiffs and Class members under the Alien Tort Statute, the Torture Victim Protection Act, and federal common law for the damages sustained by plaintiffs and the plaintiff class as a result of the violation of international law, including the Genocide Convention and the U.N. Declaration on the Rights of Indigenous Peoples;

(g) Award damages to the plaintiffs and Class members for all common and state law violations, including Conversion and Unjust Enrichment;

(h) Direct that the defendants conduct an accounting of the value of the lands, territories, natural resources, waters, livestock and other properties confiscated and taken from the Miskitu peoples;

(i) Order that a Constructive Trust be established with regard to all lands, territories, natural resources, waters, livestock and other property that was looted from plaintiffs and other Class members, and the profits derived therefrom;

(j) Award plaintiffs and other Class members punitive damages in an amount sufficient to punish defendants for their flagrant and outrageous violations of international law and to deter such future conduct; and

(k) Award plaintiffs the costs of bringing this action, including the payment of reasonable attorneys' fees; and

(l) Grant such other and further relief as this Court deems just and proper.

**Respectfully submitted, as sewn to, this 20th day of February 2017, in the City and County of San Francisco, California, United States of America.**

REV. JOSEPHENIE E. ROBERTSON, M.T.T.
IN PRORRIA PERSONA

Rev. Josephenie E. Robertson, M.T.T.
Matriarch of the Miskitu Nation
1557 Jackson St. #301
Oakland, CA 94612 - U.S.A.
Telephone: 510.410.1144
Email: ercell@miskitunation.org
In Propria Persona
